## Case No. 2,829.

CLARK et al. v. MANUFACTURERS' INS. CO.

[2 Woodb. & M. 472.][1]

Circuit Court, D. Massachusetts. May Term, 1847.[2]

INSURANCE — REPRESENTATIONS — WARRANTY — ADOPTION BY RENEWAL — NOTICE OF CHANGE — ACTION ON POLICY — DEFENSES — RECOVERY OF PREMIUMS — NEW TRIAL — PRACTICE.

1. Where a policy in the body of it refers to representations made by the assured, and provides that they are to be true, or the insurance is void, it is competent to show by evidence, dehors the policy, what the representations were.
[Cited in Albion Lead Works v. Williamsburg City F. Ins. Co., 2 Fed. 486.]

2. The usual printed questions and written answers as to cotton manufactories, made before an insurance existed in this case, as to this establishment, are presumed to be those referred to, until the contrary is shown.

3. A warranty is generally a stipulation made and described in the policy itself, and must be complied with, whether material or not; but a representation is generally not given in detail in the policy, but verbally, or in a separate writing, if the property be situated at a distance.

4. After an insurance has been renewed several times, in new names often, but for the same party largely in interest at each time, and no new representations are filed, and it is applied for by that party as agent, and for a continuance or renewal of the former insurance, this is competent evidence to show an adoption or subsequent assent to those representations, as being what is referred to in the policy.

5. Where a material fact is suppressed in such representations, the insurance is avoided, and the policy does not attach, whether the suppression happens by neglect or fraud.
[Cited in Nicoll v. American Ins. Co., Case No. 10,259.]

6. So if a material change happens after in the mode of using the property insured, and notice of this is not given to the insurer, at the time or before a renewal, the old and new policy both become null.

7. In assumpsit to recover for a loss by fire on a policy of insurance, with counts for money had and received, as well as on the policy, the

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]
[2] [Reversed in Clark v. Manufacturers' Ins. Co., 8 How. (49 U. S.) 235.]

plaintiff is entitled to recover for any premiums paid. where the policy did not attach; but they must have been paid by the same plaintiff, and within six years.

8. Where the representation was, that no lamps were used in the picking room of a manufactory, and lamps had been suspended and occasionally used there for several years, the policy did not attach. Lamps so suspended, and used when needed, must be considered, in common parlance, as used all the time, and not merely when lighted up.

9. Neglect in trusting to the memory of an agent, rather than examining the written representation on file, will not prevent a recovery back of the premiums in such case; but a fraudulent use of lamps, knowingly contrary to the representation, would prevent it.

10. Where a trial was had on the merits to recover for a loss, and a verdict was ordered for the defendants, and the claim for return of premiums was not tried, but was moved for at a subsequent day in the term, the court considered this as virtually a motion for a new trial.

11. After argument, the new trial pro forma was allowed; but it was ordered that the premiums should be returned, on condition that the plaintiff pay the costs of the first trial, the defendants having prevailed in the chief matter in controversy, viz. their liability to pay the amount of the insurance.

At law. This was an action on a policy by the defendants in favor of the plaintiffs [Eli Clark, William Green, and Hugh McGill], made August 13th, 1845. It was on a cotton factory and machinery, situated in Malone, in the state of New York, for $14,000, and was to run one year from the date. The property was alleged to be under a contract of sale by the Ogdensburg Bank to the plaintiffs, the consideration of which having not been paid, any loss happening was to be paid to said bank. A total loss of the buildings and machinery was averred to have occurred on the 13th of March, 1846. Notice and demand were alleged; and, at the trial here under the general issue of non-assumpsit at October term, 1846, the notice and demand, as well as the loss by fire and the execution of the policy, were proved or admitted. It was further proved, that the title of this property was in the Ogdensburg Bank, derived by mortgage deed and sheriff's sale, from Jonathan Stearns, between 1832 and 1838; and that the bank, January 26, 1842, contracted to sell the same to the plaintiffs, on certain terms; the plaintiffs, in the mean time, to have possession and insure the buildings and machinery, and assign the policy to the bank. Certain payments were proved to have been made on this contract, but the sum of $14,054 was still due.

The evidence showed, likewise, that the fire originated in the picking-room, which was situated in the center of the building, and in which a glass lamp was permanently suspended from the ceiling, and into which room a glass lantern was carried that evening, and placed by the workman on the window-sill while the picker was in operation. Around the top of this lantern he first saw the light and fire, as if the cotton-dust had become ignited through the air-holes, and the fire was communicated with such rapidity to the whole cotton he was unable to extinguish it. The evidence showed further, that when the picking-room had been occasionally used to work in during the night-time, this lantern, or one like it, had, for three years, been carried in; and that the globe lamp had been long used there suspended with a reflector over the top, and was lighted, when they worked at night in the picking-room, as well as the lantern. This appeared to have been the practice soon after 1834 or 1835, but no evidence was offered that it had been before.

It was also shown, in the progress of the case, that the first insurance on this property by the defendants was made July 1, 1834, to J. Stearns, for one year. It was made after previous representations by Stearns in writing, April 24, 1834, in answer to fifty interrogatories concerning the building and machinery and securities against fire. Among them were the 33d and 34th, with the answers annexed, in the following words: "(33.) How is this building lighted? If there be any lights, not inclosed in glass, used in any part of the building, state in which of the rooms such lights are used? (Answer.) No open lamps used in any part of the building except the machine-shop, and those are intended to be kept covered. (34.) Is the picker inside of the building? If within, state where situated and how secured. If in a separate building, state if the passage-way communicating with the factory is secured by an iron door at each end, or how otherwise secured? (Answer.) The picker is inside of the building; but no lamps used in the picking-room. The doors are wood, and not secured."

In that policy to Stearns was the following agreement by him: "The assured warrant that the waste shall be removed as often as once in forty-eight hours, to a safe distance from the mill, and that the lamps in the carding-rooms shall be inclosed in glass." It was further inserted as a condition in the policy, that "being made and accepted upon the representation of the said assured, contained in his application therefor, (to which reference is to be had,) it is fully understood by and between the parties thereto, that if said representation does not contain a full and true exposition of all the facts and circumstances in relation to the condition, situation, value and risk of the property hereby insured, so far as the same are material to the risk; or if the situation of the property or the circumstances affecting the risk shall be, during the existence of this policy, altered or changed by or through the advice, consent or agency of the assured, so as to increase the risk hereby assumed," &c. &c., "then, and in every such case, the risk hereby assumed shall cease, and this policy shall become void." There was an agreement on the back of that policy by the agent for the defendants, assenting to the assign-

ment of it to the Ogdensburg Bank. In July, 1835, the cashier of that bank applied for the renewal of that policy to Stearns for another year, inclosing the premium, and stating that it had been by him assigned to the bank; and a renewal was accordingly made in the same terms as the first policy, except that any loss was made payable to the bank. In August, 1836, a similar application and renewal took place between the same parties, and again in August, 1837. In August, 1838, Stearns informed the agent of the defendants, that the title to the property had become vested in the bank, and the cashier applied for a "continuance of insurance" on the former policy on the factory and machinery, omitting the stock, as the factory was not then in operation, but with liberty to put it in operation; and as the property had been transferred to the bank, the "new policy" was requested to be in its name. The new policy was accordingly issued August 13, 1838, only changing the direct insurance to the bank, with the old warranty and conditions, and the following additional clause: "It is understood that the factory is not in operation, and that the assured have liberty to put the same in operation, agreeably to the representations heretofore made by Jonathan Stearns." In August, 1839, an application was made for "the continuance" of that policy another year, and granted in the same terms, with the omission of the clause last cited. On the 12th of August, 1840, the bank applied for the "continuance" of the policy another year, and on the 14th of the same month wrote again, stating that the clause had been omitted the last year, probably by mistake, about the liberty to put the factory in operation on the representations made by Stearns, and wished it inserted this year. It accordingly was issued, dated 31st of August, 1840, for one year, in the terms used in the policy of August, 1839. On the 27th of August, 1840, the cashier of the bank wrote a letter, of which a copy is annexed:

"Ogdensburg Bank, August 27th, 1840. Parker L. Hall, Esq., Agent, &c. Dear Sir, —Will you do me the favor to send me a copy of the original survey and application, as made by Jonathan Stearns, at the time Stearns effected an insurance on the cotton factory, &c. at Malone; as I observe that the first policy made out for us specifies, 'agreeably to the representations heretofore made by Jonathan Stearns.' This institution does not know what those representations are, and as the factory is soon to be put in operation by Stearns, we having leased the same to him for one year, we wish you to send us a copy of the survey and application, in order to have Stearns's act within those representations. We also wish you to send us your assent of having the factory put in operation by Jonathan Stearns, under the policy that will take effect on the 30th instant, for one year from that time. If, on receipt of a copy of survey and application, it shall not be found sufficiently correct, you will be notified, and shall expect you will consent to have the policy adapted to the corrected application, &c. &c. In the policy of 1839 you say 'contained in their application;' I am not aware that this institution has made any specific application, and suppose you intended the one given as to details by Stearns. Very respectfully, yours, &c. John D. Judson."

To this letter the agent of the defendants replied, August 31st, 1840, stating, among other things, that he had not in his possession Stearns's representations in the "original survey;" but perhaps they could obtain a copy of him, (S.) or he could procure one from the office at Boston; adding, "You will of course see to it that the waste is removed according to the warranty, and that the lamps be enveloped in glass." The bank applied to Stearns, thereupon, and he replied that no copy of the survey had been preserved by him; "but I think," says he, "there is no provision in it but what has, as long as I run the mill, been complied with." Among other things he says, "there is not an open lamp for use in the mill, and never was;" but says nothing specially about the picking-room.

It further appeared in evidence on this, that the bank did not write to Boston for a copy of Stearns's statement, but were advised by their solicitor, in 1841 or 1842, that they were not liable for his representations. On the 4th of August, 1841, the bank applied for another "continuance" of the policy for one year, adding that the factory had been leased to Jonathan Stearns, and put in operation; and, as they might wish to continue to lease it, desired a clause allowing it. Accordingly a new policy was made, as before, with the following clause instead of the special one before named: "It is understood that the mill is under lease to Jonathan Stearns, and may again be leased to him or some other tenant, the assured being answerable for the warranty as above." In August, 1842, the tenant again applied for a further continuance of the policy one year, but having contracted to sell the property to the present possessors, who were carrying on the business, they wished the policy to bear their names, stating these facts, and providing for the payment to the bank of any loss. The policy was thus renewed on the 30th of August, 1842, adding also, "This policy is issued on the representations formerly made by Jonathan Stearns, the former owner, which representation is binding on the assured." In September, 1842, the bank wrote a letter, desiring a mistake corrected in the sum insured on the machinery, separate from that on the building, but said nothing as to any other matter. In August, 1843, another continuance of the policy was desired by the bank, retaining the same clause as to the payment of any loss to the bank. This was done, but no repetition made

in the policy of the above clause as to Stearns's representations. On a like application in August, 1844, a like renewal was made, and so in August, 1845. The plaintiffs offered to prove, further, that it was customary to use inclosed lamps in picking-rooms, and the defendants to prove the contrary, if that usage was deemed material in deciding this case. But the plaintiffs admitted as a fact, that the use of any kind of a lamp in the picking-room would enhance the danger from fire; and that though insurances were often made without written representations, when the property was situated near and its condition known to some of the directors, yet when it was remote written representations were usually required. Various objections were taken to the admissibility of parts of this evidence on both sides, and it was agreed by the parties to have the court consider them, as well as the law of the case on the parts which the court should deem to be legally proved, and direct a verdict to be entered for either party as might be thought proper by the court after such examination.

R. Fletcher and T. P. Chandler, for plaintiffs.

B. R. Curtis, for defendant.

WOODBURY, Circuit Justice. Among the preliminary questions to be decided in this case is the admissibility of some of the evidence on both sides. But that involves much of the merits, and is not free from difficulty. The various pieces of testimony as to Stearns's representations are objected to by the plaintiffs, on the ground that they bring their action on the last policy, in which nothing is said of Stearns or his representations, eo nomine; and that to prove them and make them binding would be to alter or add to this written instrument. It is certain that a written contract cannot, as a general rule, be varied by parol evidence. Some of the leading cases on this are familiar, and may be seen in 1 Greenl. Ev. c. 15, p. 315; 8 Bing. 244; Philips v. Preston, 5 How. [46 U. S.] 291. Their application to policies of insurance as well as other writings, is shown in Duer, Ins. 71; 2 Johns. Cas. 1; Higginson v. Dall, 13 Mass. 96; 8 Wend. 160; 8 Metc. [Mass.] 348; 2 Cranch, C. C. 249 [Bank of Washington v. Way, Case No. 957].

It is not necessary to multiply references on this general principle, or its application to policies, nor to explain the numerous exceptions which do not affect the present transaction; for the testimony here is offered, not with the design to show representations different from those referred to in the policy, or to add to them, but to show what those were which had thus been referred to. The policy itself does not profess to embody into it the representations which had been made and which were to be binding, but merely al-

ludes to them, and makes their truth a condition precedent to any recovery. Such references to other matter, written or parol, are very common in deeds, wills, and other contracts, and it is no violation of the contract to prove, either by writing or verbally, the foreign matter thus alluded to. On the contrary, it complies with the contract when doing this, rather than contradicts or waives it. Most of the descriptions of boundaries in deeds are by such references to other deeds or to monuments and other facts, and showing dehors the matter thus referred to, is carrying the deed into effect and not altering it. 1 Phil. Ins. 47; 1 Durn. & E. [Term R.] 343; 16 Pick. 502. Had certain representations been introduced into the policy itself, as to the condition of this property, stating in detail how it stood in respect to various items affecting the risk by fire, the presumption would be that these were the representations meant to be referred to in the policy, and others, perhaps, could not be shown. But when none such were inserted in it, as here, and when it is usual not to do it in such instruments. but to place on file such written statements as to particular matters affecting the risk, if the property is at a distance, and sometimes to make them verbally, the policy, in speaking generally of the representations, must of course refer to such, and be intended by both parties to rest upon them as binding. [Columbia Ins. Co. v. Lawrence] 2 Pet. [27 U. S.] 47, 10 Pet. [35 U. S.] 515. They are as if a part of the contract. 2 Denio, 75. In showing what they were under such a reference, the general rule is not to change a written contract by parol evidence, or to vary it by other matter not belonging to it, though in writing, cannot be considered as impugned either in form or substance. Houghton v. Manuf'g Ins. Co., 8 Metc. [Mass.] 114; Ellery v. Merchants' Ins. Co., 3 Pick. 350; Foxcroft v. Mallet, 4 How. [45 U. S.] 353; Wig. Ev. 54, 55; 3 Barn. & Ald. 299; 1 Paige, 291; 20 Pick. 121. This conclusion rests on this ground, and not on the admissibility of parol evidence to explain a latent ambiguity, or expression, which, from surrounding and connected facts, may have one of two meanings, and which facts may therefore be shown by parol, if the ambiguity or uncertainty be one as to facts and not as to law. 1 Story, Eq. Jur. 503; Wig. Ev. 176; Colpoys v. Colpoys, Jac. 463. The parol evidence is not to contradict the writing, but in such case is consistent with it. 2 Brod. & B. 553; 4 Russ. 540.

Another objection to the admissibility of some of the evidence here is, that the representations made by Stearns are not binding on the plaintiffs; but it is a well settled principle, that what a party says or does by an agent, is as binding as if said or done by himself; and the doings of a person may be adopted or ratified afterwards as if an agent, no less conclusively than if he was authorized beforehand. This is elementary law in

every text book on agency. Hence, throughout, in this case, the bank was the chief, the real principal; and is now. All said or done by others, or in others' names, was said or done in its behalf. The bank was the party in interest here from the start to the close. It was to receive any payments for losses on any of the policies from the first to the last inclusive. The next objection to the admissibility of evidence was made by the defendants, and related to that offered by the plaintiffs to show what Stearns wrote to them in respect to his representations, and what the bank was advised on this point by their counsel. If the chief question in this case was one of intent, such testimony might be competent as a part of the res gestae, to prove efforts on the part of the plaintiffs to conform to Stearns's supposed representations. But it was unnecessary to show their omission to do more on the subject to obtain a copy of them, under professional advice, because they were not liable on account of their intentions. This evidence may also operate in favor of the defendants, being a circumstance to show the recognition by the bank at that time of their duty to conform to Stearns's representations, in that particular policy where a clause requiring it was expressly introduced, as it had been, at the time one letter was written to the agent of the defendants and one to Stearns on this matter. But it is not evidence to exonerate the bank from its duty to comply with the representations on file on account of what Stearns or their counsel afterwards said, it being the misfortune of the bank, if either of them erred in their statements they made or in their advice; and the only remedy, if any, by the bank for such an error, being against those persons.

Having disposed of these preliminary points, the next inquiry is, what were the representations which the present plaintiffs must in fact and law be considered as having made in respect to their property, as connected with the risk by fire? In order to decide intelligibly, it will be necessary to advert to the fact, that the first nominal insurer of this property at the office of the defendants, was Jonathan Stearns. However the case may be as to insurances, where no representations are made to the insurers as to the risks belonging to the premises, which are great and would sensibly increase the danger; and however in marine policies any omission to make full disclosures on such matters may vitiate the insurance on account of the suppression of a part of the whole truth, rather than a suggestion of what is false, it is to be remembered, that Stearns in this case actually made long and written representations on inquiries put by the defendants. They were his written answers to the printed interrogatories, usually put in the case of distant manufactories applying to be insured. The insurance was effected to him on the faith of the truth of those representations, and on the express stipulation, that the policy should be void, if they were materially untrue, or the condition of the property should become changed so as materially to increase the risk, and notice not be given to the defendants of such change. The representations referred to in this policy, were not then a mere form in the instrument, when none whatever had been really made; but they referred to an actual occurrence between these parties, and an important occurrence, considering the distance of the factory from the office, and the probable want of personal knowledge about its condition by the directors.

Under this view of the facts of the present case, the next inquiry, and one of some complexity and difficulty is, whether the same representations must be considered as made or adopted by the plaintiffs in the insurance for 1846, now in suit. In order to form a correct conclusion as to that, being a matter of fact principally, it will be necessary to advert to the important circumstance before mentioned, that the Ogsdenburg Bank, for whose benefit the present suit is instituted, was the chief party in interest in the first insurance by Stearns, and has been in all the intervening insurances made from 1834 to 1846. That not only the first one was assigned to the bank at its date, but the defendants, informed of the bank's interest, and assenting to the assignment and in every renewal since, any loss happening was to be paid to the bank, and the cashier of it was the agent to effect the renewal and advance the premium; and that the bank now appears to have a claim on the property to a larger amount than the sum insured. All the different persons then in 1834 and since, to whom the insurances nominally run, including the present plaintiffs, were virtually in this transaction but agents for the bank to the extent of its interests. They acted at its request, and in its behalf, and for its security; and generally, the bank itself, rather than they, transacted the business, and saw to its correctness, and had possession of the policies as well as advanced the premiums. The other persons had rights and interests, also, but subordinate. They either had a residuary interest, or a right by contract to the property and insurance after the bank was satisfied. In 1838 the title had become vested entirely in the bank; and the policy was then made in its own name, as well as on its account and for its interest. No new representations had been made since Stearns's original ones on file in 1834; and this the bank doubtless knew, as it not only received the assignment of their policy for that year, referring to those representations, but had itself taken out the subsequent renewals without filing any new representations. In order to remove any doubt, that in the general allusion to representations in the policy as made by the insured, and on which

the policy in 1838 was founded, it was meant to adopt those on which the policy of 1834 and in the intervening years had issued, it was stated separately in A. D. 1838, that though the factory was not then in operation, "the assured have liberty to put the same in operation, agreeably to the representations heretofore made by Jonathan Stearns." If the bank did not know with certainty the extent of those representations, it was the fault and risk of itself to undertake to act on them without such knowledge. In 1839 that special clause was omitted. This was probably done either because deemed unnecessary to repeat it in addition to the general clause referring to representations, or because the factory was not in operation. And in 1840, the bank itself, fearing lest it might not be permissible to resume operations without a special permission, desired it, and this same clause was restored among other things, expressly specifying Stearns's representations as those which were in that event to govern. The bank then, by letter, asked of the agent a copy of those representations, but as he had not the original, applied to Stearns, who also had no duplicate original or copy. But Stearns stated that he had always complied with the representations, saying nothing in particular about the picking-room. Without inquiring further as to their exact contents, unfortunately the bank, under advice of counsel, acquiesced in the policy as it stood, and put the factory in operation under it, through Stearns himself, by a lease to him for that purpose, having stated in their letter that they supposed "the application referred to in the policy was that made by Stearns." Not the least doubt, then, can exist, that the property was used in 1840, under Stearns's representations as originally made, and used by himself under the bank. They either knowingly and deliberately expected to conform to them, and, in case of material variation and a loss, to have the policy void; or relied on advice of counsel that they were not binding. It is likewise clear, that if Stearns misled the bank, either through forgetfulness or design, as to the extent or character of his written representations to the defendants, which seems probable, the consequences must fall on them, the employers of Stearns, and the confiders in him, rather than on the defendants. See Smith v. Babcock [Case No. 13,009]; Mason v. Crosby [Id. 9,234]. The change in phraseology in the policy of 1841 creates some difficulty as to that year, and may have misled their counsel, if his advice was predicated on that, and applied to that year, and not the previous one. It does not omit the special clause entirely, as in 1839, and thus appear to rely on the notice given by it in 1838, and the general reference to representations, which could mean only those made by Stearns originally, and since adopted by the bank, as none others had

been made, and Stearns was their agent in interest. But it specially permits the factory to be used, "the assured being answerable for the warranty above," there being immediately above a warranty to remove the waste once in forty-eight hours; and "that the lamps in the carding-rooms shall be inclosed in glass." It may hastily have been inferred from this that these were the only precautions to be observed, and that the insured had no farther concern or liability on account of any of Stearns's representations. But it is to be noticed, that this same warranty was in the original policy in 1834, and a reference also to the representations made by Stearns, and their binding force in all respects was there, as well as here, recognized, so that one had not been introduced for the other. This was the case also in the intervening years, while the factory was in operation, both provisions being often inserted together; and when the special clause was inserted referring to Stearns's representations, eo nomine, it seemed to be only because the factory was not then in actual operation, but might become so in the course of the year, and was then to be used in the manner he had represented. The parties, too, being presumed to know the law, must be considered as aware of the distinction between warranties and mere representations. Both usually exist, though as to different matters. Generally, likewise the former are in the body of the instrument, and are there named as warranties in words or substance, or referred to as such (5 Hill, 101; 2 Hall, 589; Cowp. 785; Doug. 11, note); while the latter are referred to only as representations or statements of facts, and are seldom introduced in detail in the policy itself (3 Hill, 501; 5 Hill, 101, 188). The former, likewise, bind the party to them as a condition precedent, whether material or not; while the latter binds only to a substantial or virtual compliance, and may vary from the exact part, if the variance be not so material as to increase clearly the risk. In 1841, then, the warranty was one thing, and provided for by itself; the representations were another, and provided for by themselves, and in the same manner they had been in 1834. Stearns was the real operator at both periods. The bank was the virtual owner at both. The representations at both were only those originally made by Stearns, and this the bank probably knew, and that they were relied on by the defendants, as being adopted by the bank. The bank, too, had paid the premium, and took out the policy in 1841, as only a "continuance" of the previous policies. It seems to me, then, to be inconsistent with the general character of the whole transaction, and it would be bad faith to suppose that the representations, referred to in the general clause, were not meant by both parties to be those at first made by Stearns, and since continued, or renewed, or in other words, adopted by the bank as its own. If

any aggregatio mentium, any unity of views existed, it must be presumed to have been that. In 1843, the bank desired a renewal of the policy, still running to pay the loss to them, though wishing the policy to bear the names of the plaintiffs, as they had made a contract to purchase and use the factory. The policy was accordingly then renewed; and, perhaps, because a new party was introduced, a special provision was inserted, so that the plaintiffs could not, any more than the bank, plead ignorance of the representations upon which the insurance rested. It was in these words: "This policy is issued on the representations formerly made by Jona. Stearns, the former owner, which representation is binding on the assured." No objection was made to this, though the policy was sent back for correction in another particular. In 1844 and 1845, "continuances" of the policy were granted, in like form, without repealing the special clause, as the nominal or real parties in interest remained the same; and the reason applicable to those representations being in force, and being, in my opinion, in point of fact, adopted by the insured, for the causes which have just been named and explained in respect to the year 1841.

I have been thus particular in tracing through to the close, and assigning various reasons why Stearns's representations must be considered as adopted by the plaintiffs themselves, in the policy itself, and binding on them as a part of the written contract; and not as parol evidence of matter introduced to vary or contradict the written contract. But were this otherwise, it is by no means certain, whether, on the general principles of insurance, the plaintiffs would not be responsible for the use of any lamps in the picking-room, considering either that none were used originally, or that Stearns's statement to that effect was untrue. If an absolute representation is made by the insured in respect to the risk, which is material, and others then interested renew the insurance without varying the statement, and a privity of interest or contract is kept up until a loss occurs, surely the loss ought not to fall on the insurer, when it happens by a departure from that statement and on a particular, which it is agreed increased the risk. Columbian Ins. Co. v. Lawrence, 10 Pet. [35 U. S.] 508; Alsop v. Commercial Ins. Co. [Case No. 262]; 2 Denio, 75. Surely the assured ought not to recover when they were expressly notified that the insurance was founded and renewed on the representations thus made, though the assured may not have examined what they were, but had an opportunity to do it, and unwisely confided in the recollection of the person making them without examining the original on file. If the lamps were used in the picking-room at first when Stearns stated otherwise, such a material misrepresentation would vitiate insurances generally. [Columbian Ins. Co. v. Lawrence] 2 Pet. [27 U. S.] 47, 10 Pet. [35

U. S.] 516. If they were not so used at first, but the lamps were soon after introduced into the picking-room, any material change like this in the risk of property, without communicating it, (before a new insurance, or a further continuance of the old one to the same parties in interest,) renders the new policy void. It clashes with the stipulations of the policy itself, and in all stages of the case there must be neither suppressio veri, nor suggestio falsi. Duer, Ins. 380. There need be no fraudulent intent; but if either of these acts exists without such an intent, it saps the foundation on which the insurance rests, and the latter fails. Id. 506; 1 Phil. Ins. 210; [Columbian Ins. Co. v. Lawrence] 2 Pet. [27 U. S.] 25; 22 Pick. 200; [M'Lanahan v. Universal Ins. Co.] 1 Pet. [26 U. S.] 185; 3 Mass. 103; [Murgatroyd v. Crawford] 3 Dall. [3 U. S.] 491; 6 Mass. 220; 18 Pick. 419; 10 Pick. 535; 5 Hill, 101, 188; [Hazard's Adm'rs v. Marine Ins. Co.] 8 Pet. [33 U. S.] 557; 20 Me. 125; 8 Metc. [Mass.] 114. Another fact, strongly indicating that the bank, the party in interest throughout, must have known and expected, that all the continuances or renewals of the policy were founded on the original representations, was, that these renewals were all made through the agent at Pittsfield, and not at the office at Boston; and that in this case, as in most cases of insurance, the office alone takes new insurances or new risks, and acts on new or different representations, and not the agent.

Regarding the evidence here offered as to the representations to be in law competent, and to show in fact the adoption by the plaintiffs of those made by Stearns, and considering also that this evidence would, independent of the words of the policy in another view, show either a material misrepresentation by the original assured, or a material change in the risk since, not communicated by him or the privies in interest and contract since, the policy must in law be considered void. This is a misfortune to the present plaintiffs as well as the bank; because the latter was probably misled by Stearns's letter as to the extent of his original representations, and may have believed that they extended only to the keeping of no uninclosed lamps in the building, but allowed such in the picking-room as well as in other parts of the building. Had they not believed this, they would probably have discontinued the use of them in the picking-room, or had the original representation altered, or a new one communicated, and paid the increased premium, which such use of lamps would justify and require. The difference is conceded to be material, and well may be, as in this very instance the loss was caused by the use of lamps there, though inclosed in glass. Such is the extraordinary fineness of the cotton fibres and dust which fills the air in that room, in factories in great quantities, that any lamp which has air holes, or an open top and loose cover, (such as are necessary to

continue or preserve the light,) is liable to be filled with them and to ignite them, and, unless the building is detached or secured by iron doors, to cause the almost inevitable loss of the whole establishment. Again, the insured, had they examined the policy carefully, would have seen from the warranty, that the use of any lamps in the picking-room was probably not contemplated. The warranty extends only to "the lamps in the carding-room;" that they shall be "inclosed in glass;" and, had it been represented, or at any time understood by the insurers, that lamps were to be used in the picking-room also, the insured must presume that they would doubtless have required the warranty to cover them, as well as those in the carding-room, it being more necessary for safety to have them so inclosed if in the picking-room. But the original representation was, "no lamps used in the picking-room;" and hence no warranty was required to keep them there inclosed in glass, and no increase of premium asked on account of their being kept there at all, so dangerous as it was in a room not separate from the main building, and not made safe by iron doors. It is to be recollected, that such a room in a cotton factory, thus situated, is almost as perilous as a powder-magazine, to use lamps in. It is full of the material for gunpowder cotton; and all representations concerning it, or changes of risk in relation to it, must be known by all the parties to be vital. It is conceded, that the assured is entitled to a favorable construction, in particulars which are doubtful. Duer, Ins. 132. But this is where the insured is not misled by any erroneous representation, or any material change in the risk not communicated to him. For where either of those occur, whether through the fault or neglect of the assured, or his agent, the policy cannot be enforced. Carpenter v. Providence Washington Ins. Co., 4 How. [45 U. S.] 185. The insurer is entitled, both in law and equity, to all the material information, connected with the risk, which the insured possesses, in order that he may have the fullest means of deciding on the extent of the risk and premium. 1 Wash. C. C. 161 [Kohne v. Insurance Co. of North America, Case No. 7,922]; [Livingston v. Maryland Ins. Co.] 6 Cranch [10 U. S.] 279; [Maryland Ins. Co. v. Ruden's Adm'r] Id. 338. The law is rigorous and unaccommodating, even to forgetfulness, mistake, or neglect of agents on the part of the insured, in respect to matters like these. Jennings v. Chenango Mut. Ins. Co., 2 Denio, 75.

Something has been said in the argument that the word "lamps," as used here in the representation, meant only permanent ones, and not movable lamps or lanterns; and that the latter might be used any where. But as the warranty was to keep them inclosed in glass when used in the carding-room, and by the original representation none were used in the picking-room, the word "lamp" would seem to include any light or blaze in the lamp form, as any such was to be inclosed in glass. The spirit of the provision, as well as the general meaning of the expression, would extend to any thing of the kind that could cause combustion in giving light, whether movable or permanent. Indeed, movable lights or lanterns are in such rooms more dangerous, though inclosed in glass, than permanent ones, as the latter can be fixed more remote from the machinery, while the former are usually employed to aid in closer observations and repairs, and constantly subject to be carried nearer what is most combustible. On the hypothesis of the plaintiffs, as to this point, this inconsistency would follow, that movable lights, the most dangerous, could be used in the picking-room, but not permanent ones, the least dangerous; or that the parties would deem it so important to have lamps covered with glass in the carding-room, as to enter into a warranty to do it, and yet intend or assent that lanterns or lamps should be used in the picking-room, without any warranty to keep them inclosed in glass. It becomes unnecessary, therefore, to go into the evidence, whether it is customary to use lamps in picking-rooms; or if at all, in those situated within the factory, and without iron doors. Because, whatever may be the usage, it is conceded, that they enhance the risk; and the representation here was originally that none were used in the picking-room. If that statement was true, then they were since introduced, without notice, and thus materially increase the risk, and avoided the policy. If that statement was false, then the policy was void, on the ground of a false and important representation. [Columbia Ins. Co. v. Lawrence] 2 Pet. [27 U. S.] 49, 10 Pet. [35 U. S.] 512; [M'Lanahan v. Universal Ins. Co.] 1 Pet. [26 U. S.] 185; [Carpenter v. Providence Ins. Co.] 16 Pet. [41 U. S.] 496; 10 Pick. 535; 1 Wash. C. C. 161 [Kohne v. Insurance Co. of North America, Case No. 7,922]. In either of these aspects of the case, therefore, that evidence becomes of no importance; and a verdict must, according to agreement, be entered for the defendants.

After the above opinion had been delivered, and at a subsequent day in the term, the plaintiffs moved for a verdict and judgment for a return of the premiums that had been paid on these insurances. The grounds assigned were, that the policy did not attach, looking to the opinion of the court, and that a money count was in the declaration, which would cover the premiums. After argument for and against this motion, by the same counsel, the court took time to consider of it, and before the term closed, made the following decision, delivered by

WOODBURY, Circuit Justice. My first impressions were not in favor of this motion, either on its merits or on the adopted form.

On the merits it seemed doubtful whether the policy must not be considered to have attached from the time named in it, till some actual instance of the use of lamps in the picking-room. occurred. If it once attaches, the premium is not to be restored, however short the time. Cowp. 668. Certainly not the whole of the premium, and none unless it can be properly divided, and a part of the risk, as in some sea usages, can be considered as never having been incurred. 3 Burrows, 1240; 1 W. Bl. 315. But on consideration that, in this class of cases, the construction more favorable to the insured is the approved one, and seems on the whole most equitable, I think the representations can fairly be regarded as of such a character that the risk never did commence. The representations were on this point, "no lamps used in the picking-room." Now, in fact, lamps were there suspended in that room constantly, and had been for some years, and others carried into it occasionally at the time of the last insurance, and of all the others made to those plaintiffs. This must be regarded as "lamps used" there, in common parlance, during this period, though not really lighted up the whole time, nor on the precise day when this policy commenced. If the lamps had been first introduced after the year began, it would be otherwise. Pim v. Reid, 6 Scott, N. R. 982. What strengthens this view, that they must be considered as used before, is another consideration, that the plaintiffs used them there under a false impression caused by Stearns, the former owner and the original maker of the representation, stating that he had a right to use them there under the policy, if kept inclosed in glass. Hence they were placed there to be used long before, were used when needed, and must be regarded as a violation, though undesignedly, of the terms of the policy during the whole period, after introduced. It is well settled, that where the risk never attached, the premium must be returned, if there was no fraud. Feise v. Parkinson, 4 Taunt. 641; Colby v. Hunter, Moody & M. 81; 3 Car. & P. 7; 2 Phil. Ins. 526. It must be returned, though there was "neglect and even fault," by the assured. Stevenson v. Snow, 3 Burrows, 1240; Tyrie v. Fletcher, Cowp. 668. Here neglect existed in relying on Stearns's memory, but probably no designed departure fraudulently from what the policy was supposed to be. If the lamps were fraudulently used there, in disregard of the representations, the premiums should be retained by the company. 4 Taunt. 641; 1 Park, Ins. 329; 2 Marsh. Ins. 661. It will be seen, however, that the circumstances just referred to, showing how these parties were misled into their use, repel any presumption of such fraud.

All that remains, then, are some questions of form. How many of the premiums can be recovered back in this action, in the name of these plaintiffs? Manifestly none, except those paid on policies executed to these plaintiffs. Any others, paid on policies to others, must be recovered, if at all, in suits in their names; and the statute of limitations would bar all except those paid by these plaintiffs, and perhaps one other, if an action is ever instituted for that. Again, in respect to form, this suit, looking to the count for money had and received, can, in my view, properly cover all premiums between these parties paid within six years, and is not confined to the premium paid on the last policy, named in the special count. The other premiums are in cases where the risk did not attach as well as this. The parties are the same. The form of the count applies to all; and all of them rest on the same basis of not being ex aequo et bono, retainable by the office, when the risk never attached. The first premium paid by these plaintiffs on an insurance to them was in August, 1842, and the last one in August, 1845; making four in all to be returned.

The remaining point to be considered, in respect to form, is the time and manner of moving "for the return" of the premiums. At the trial of the cause, no claim of that kind was understood to be urged. In the testimony submitted to me, and in the argument, my attention was not called to any claim of this kind. It was not till an opinion on the merits of the action for a loss under the policy had been given by agreement, on both the facts and the law, and a verdict directed for the defendants, that this claim on a subsequent day was presented. If allowed now, unless by consent, it must be virtually, by granting a new trial. That was the course pursued under like circumstances, in Feise v. Parkinson, 4 Taunt. 641.

What should be the terms which are just for allowing this new trial, under all the circumstances, or, which is the same thing in substance, for changing at this time the verdict, so as to be for the plaintiff instead of the defendants, and throwing the burthen of costs in the cause on the latter, rather than where it now is, on the former? It seems to me that the just terms should be the payment to the defendants of the costs of the trial, in which they succeeded, which was upon the great point in controversy, and the fruits of which, so far as regards costs, are now asked to be taken from them by allowing this motion. As another illustration, showing that these terms are the proper ones, if this claim for a return premium had been set up at the former trial, the defendants might have paid the amount into court, with costs to that time; and then, if the plaintiffs failed to recover any thing for losses, they would have to pay the defendants the costs of that trial. See, also, 4 Bing. 676.

Let then the former verdict, ordered for the defendant, be considered as set aside, and a new trial granted, on the payment to the defendants of the cost of the former trial. Then on the new trial let a new ver-

dict be entered for the plaintiffs for the four last premiums and costs of suit, except those incurred at the former trial, and which we now allow to the defendants, as the prevailing parties in that trial.

NOTE [from original report]. By agreement of counsel, the opinions of the court on the law of the case. as originally presented, were turned into rulings and instructions, and a bill of exceptions filed so as to carry the case to the supreme court.

[NOTE. Plaintiffs brought error, and the supreme court, without overruling the law of this case, reversed the judgment for the purpose of having the defective record corrected. Clark v. Manufacturers' Ins. Co., 8 How. (49 U. S.) 235.]